IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| LINCOLN DAWSON, JR. | : | CIVIL ACTION |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA MEDIA | : | |
| HOLDINGS, LLC | : | NO. 06-3604 |

## MEMORANDUM AND ORDER

McLaughlin, J.                                    July 18, 2008

          This is an employment discrimination and retaliation
case brought by Lincoln Dawson, Jr., an advertising sales
representative, against Philadelphia Media Holdings, Inc.
("PMH"), the successor-in-interest to his former employer,
Philadelphia Newspapers, Inc. ("PNI").[1]

          Dawson, who is African-American, worked for PNI as a
commissioned advertising sales representative from August 1998
until March 2005. As a commissioned sales representative, Dawson
was paid a commission on the revenue he generated from his
advertising accounts. Dawson alleges that, after a
reorganization of its sales force in May 2003, PNI discriminated
against him by assigning him to less lucrative clients and less
lucrative geographic locations than comparable white employees.

---

[1]  PMH is the successor-in-interest to PNI, having purchased
PNI in June 2006. Defendant's Statement of Undisputed Facts in
Support of its Motion for Summary Judgment (PMH Stat. of Facts")
at ¶¶ 2-3; Plaintiff's Amended and Supplemental Answer to
Defendant's Statement ("Pl. Stat. of Facts") at ¶¶ 2-3.

Dawson alleges this led to his constructive discharge in March 2005.  Dawson also alleges that he was retaliated against when he complained to his supervisors about the discriminatory distribution of territories and other discriminatory treatment. He also complains of racial harassment.  Dawson brings his claims of under 42 U.S.C. § 1981, as modified by the Civil Rights Act of 1991.  Compl. ¶¶ 1, 27-30.

PMH has now moved for summary judgment, arguing that it had legitimate non-discriminatory reasons for all of the allegedly discriminatory or retaliatory actions put forward by Dawson and that Dawson was neither constructively discharged nor racially harassed.  Dawson opposes summary judgment alleging that there are disputed issues of fact on these issues.  For the reasons set out below, the Court will grant PMH's motion and dismiss Dawson's claims.

I.   Facts

Many of the facts here are undisputed and have been stipulated to by the parties.  Where the parties have agreed that a fact is undisputed, the Court has not given a citation to the record.

A.   Dawson's Employment with PNI Prior to Its 2003
     Reorganization of Its Sales Force

Plaintiff Lincoln Dawson, Jr. worked at PNI from August
1998 through March 2005 in a variety of sales positions. From
August 1998 to May 2003, Dawson worked for PNI as a Commissioned
Retail Sales Development Representative.

Under the system PNI had in place as of March 2003,
commissioned sales representatives like Dawson were
geographically assigned to different counties and were permitted
to sell advertising anywhere in their assigned territory. As of
March 2003, Dawson was assigned to Philadelphia County and could
sell advertising anywhere within that county. Commissioned sales
representatives were also permitted to solicit any advertising
business that they wished, with limited restrictions. One of
those restrictions was that sales representatives were not
allowed to solicit an account that another commissioned
representative had done business with in the preceding thirteen
months.

As of March 2003, Dawson was one of 72 commissioned
sales representatives at PNI, all of whom were paid a commission
on the advertising they sold for the Philadelphia Inquirer or the
Philadelphia Daily News. In this position, Dawson was employed
in PNI's Advertising Department, which in March 2003 had 240
employees. Dawson worked in a subsection of the Advertising
Department called the Retail Sub-Department.

-3-

B.    PNI's Decides to Reorganize its Advertising Sales.

PNI experienced a 4% drop in its advertising market share from 1999 to 2002. Beginning in late 2002 to early 2003, PNI compiled a team of high-level Advertising Department managers and directors to propose changes to reverse this negative advertising trend. Neither Dawson nor any other employee at his level participated in the meetings of this team. The result of these meetings was a proposal called the "Advertising Shared Growth Plan" (the "Plan"), which among other things, proposed changes to the organization of the Advertising Department and to the commission program for commissioned sales representatives like Dawson.

The changes proposed under the Plan were designed to increase incentives to promote growth in existing advertising accounts and to assign specific territories and specific accounts. These changes were explained to Advertising Department employees in a slide presentation. With respect to commissioned sales employees, the Plan's principal change was to reorganize and reassign sales territories.

-4-

C.   PNI's 2003 Reorganization of its Sales Representatives

Under the Plan, 45 of PNI's 72 commissioned sales representatives were assigned to specific geographic territories within a county.[2]  These 45 commissioned representatives were to be limited to selling advertising in their assigned territory, unless the customer they wished to solicit was an "out-of-market account," defined as an account located outside of the Philadelphia metropolitan area.  Out of market accounts were not included in the territories assigned by the Plan.  Sales leads were given to the commissioned sales representative responsible for the territory in which the lead was located.

PNI's purpose in assigning the commissioned representatives to individual territories was to force them to become experts in a particular geographic area and to make it easier for them to travel to their clients.  PNI also wanted to make sure that every part of the Philadelphia metropolitan area was covered by a sales representative.

Under the Plan, the 45 commissioned sales representatives who were assigned to particular territories were structured into two tiers, Micro-Zone Representatives and Regional Zone Representatives.  Micro-Zone representatives were assigned to territories based on "zip code clusters."  Each

_____

[2]     It is not clear from the summary judgment record what happened under the Plan to the 27 other sales representatives.

Micro-Zone consisted of territories that historically had produced between $200,000 and $400,000 of revenue for PNI and which were therefore expected to result in $36,000 to $72,000 in compensation to each Micro-Zone Representative.

Eric Mayberry, the Daily News Director of Advertising, testified in a deposition in another case that Micro-Zone territories were smaller than the Regional Zone territories and therefore the Regional Zone territories were "better territories with more business and more opportunities."[3]

D.      The Assignment of Sales Representatives to Micro-Zones

The general format of the Micro-Zone territories created by the Plan was determined by committee. PNI's Advertising Expense Supervisor, Dan Britton, a Caucasian, was responsible for calculating the projected revenue of each zip code, based on historical revenue performance, which was used in creating the Micro-Zones. Eric Mayberry, the Daily News Director of Advertising and an African-American, and his subordinate Michael Gagliardi, the Daily News Sales Supervisor and a Caucasian, finalized the design of the territories and

---

[3]      Mayberry Deposition in Davis v. PNI, No. 05-cv-2127 (E.D. Pa.) (Ex. 9 to PMH Br.) at 50. In support of its motion for summary judgment, PMH submitted deposition testimony taken in the Davis case, a case involving another PNI employee in which Dawson was a witness, but not a party. Dawson has not objected to the use of this testimony and has relied upon his deposition in Davis to oppose summary judgment.

distributed them to the Micro-Zone and Regional Representatives whom they supervised. Mayberry made the final decision as to which representatives he supervised would be assigned to which territory.

Mayberry and Gagliardi assigned territories based on the past performance of each commissioned sales representative. Part of the evaluation of past performance included an evaluation of where the representative's existing accounts were located. Mayberry and Gagliardi sought to assign territories so that representatives would be soliciting the same amount of revenue after the implementation of the Plan as they were before the Plan. Mayberry and Gagliardi also assigned territories to representatives in which the representative already had pre-existing accounts. Gagliardi said that in trying to equalize revenue between territories, he and Mayberry took into account a sales representatives out-of-market business, which was not included in the zip code territories.[4]

The Plan became effective in May 2003. Under the Plan, Dawson was designated as a Micro-Zone representative and assigned to a micro-zone. Mayberry and Gagliardi were Dawson's supervisors and were responsible for assigning him to his new territory.

_____

[4]    Gagliardi Deposition (Ex. 16 to PMH Br.) at 34-35.

-7-

At the "kickoff meeting" for the Plan, everyone was given a package that contained a map of their newly assigned areas and the new accounts in those areas. Prior to the meeting, all sales representatives had to give up their account folders to Michael Gagliardi so that they could be reassigned.[5]

Dawson had only had three pre-existing accounts in the territory he was assigned.[6] Dawson, however, had more pre-existing accounts in the territory to which he was assigned than any other commissioned sales representative.

Prior to the reassignment, Dawson ranked 48th in revenue production among commissioned sales representatives for the year ending 2002.[7] In 2002, PNI made approximately $290,061 of revenue from accounts attributed to Dawson. Of this $290,061, $74,424 came from "out-of-market accounts," which Dawson was entitled to keep servicing under the Plan. For the first six months of 2003, prior to the implementation of the Plan, PNI made approximately $127,301 from accounts attributed to Dawson; for

---

[5]     Dawson 3/21/07 Deposition (Ex. B to Appx. to Pl. Br.) at 138; Gagliardi Deposition (Ex. 16 to PMH Br.) at 29-30.

[6]     Dawson 3/21/07 Deposition (Ex. B to Appx. to Pl. Br.) at 138.

[7]     Dawson's sales ranking for 2002, which is not disputed by the parties, is taken from a PNI chart entitled "Sales Rep YTD 2002 through Period 12," (Ex. 19 to PMH's Br.).  This chart appears to list all sales representatives, not just commissioned sales representatives like Dawson because it contains sales records for over 150 names.

the second six months of 2003, after the implementation of the Plan, PNI made approximately $119,586 (or 6% less) from accounts assigned to Dawson.

F.   The Effect of the Reorganization on African-Americans

PMH has submitted an expert report from Samuel J. Kursh, DBA in support of its motion for summary judgment.

Kursh states that, for the 12 months prior to the implementation of the Plan, the average monthly commission earnings for African-American commissioned sales representatives were slightly less than the average for Caucasian commissioned sales representatives.  During the 12 months after the implementation of the Plan, the average monthly commission earnings for African-American commissioned representatives were slightly more than for Caucasian commissioned sales representatives.  Kursh states that this difference before and after the implementation of the Plan is not statistically significant.[8]

Dawson concedes these facts, but argues that these average monthly earning figures do not indicate whether the earning potential of the zip-code-based territories under the

_____

[8]   See PMH Stat. of Facts at ¶¶ 24-25; Pl. Stat. of Facts at ¶¶ 24-25; Expert Report of Samuel J. Kursh, DBA (Ex. 14 to PMH Br.), at 2-3.

-9-

Plan was greater for territories assigned to Caucasians than for

territories assigned to African-Americans.

    F.    Dawson's Complaints about His Treatment at PNI and
         about the Assignment of Micro-Zones

        After the 2003 reorganization, Dawson complained about

the Micro-Zone to which he had been assigned under the Plan.[9]

_____

    [9]    The summary judgment record shows that, before the
reorganization, Dawson had complained of discrimination in PNI's
pre-redeployment sales practices.  In his deposition, Dawson
testified that before the redeployment he believed his
supervisor, Gagliardi, was assigning sales leads unfairly, giving
better quality leads to white sales representatives and giving
poorer quality leads, often involving minority customers, to
Dawson and other minority sales representatives.  Dawson 4/11/06
Deposition in Davis v. PNI, (Ex. B to Appx. to Pl. Br.) at 44-47;
Dawson 3/21/07 Deposition (Ex. C to Appx. to Pl. Br.) at 111-
121, 123-25.  Dawson testified that he complained to Galiardi's
superior before the reorganization and told the supervisor that
he believed Gagliardi was a racist and was treating him and other
employees differently because of race.  Dawson 4/11/06 Deposition
in Davis v. PNI, (Ex. B to Appx. to Pl. Br.) at 46; Dawson
3/21/07 Deposition (Ex. C to Appx. to Pl. Br.) at 118, 126, 131-
32.

    Dawson's complaints about discrimination that occurred
before the reorganization are not part of his claims in this
case.  None of these alleged pre-reorganization acts of
discrimination are mentioned in Dawson's complaint or in his
opposition to summary judgment.  When questioned at oral
argument, Dawson's counsel conceded these acts were not in
Dawson's papers and described them as "just kind of background to
. . . the problems that [Dawson] experienced with Gagliardi
because Gagliardi was his supervisor post-deployment."  1/30/08
Tr. of Oral Arg. at 8-10.  Based on counsel's statement at oral
argument and the failure to include these pre-reorganization acts
in Dawson's complaint or opposition to summary judgment, the
Court will not address these pre-reorganization acts as part of
Dawson's claims.  The Court, however, will consider Dawson's
testimony concerning these pre-reorganization acts as
"background" evidence to the extent it supports Dawson's claims
that Gagliardi's post-redeployment actions were motivated by

-10-

Dawson's Micro-Zone included areas in North Philadelphia colloquially referred to as the "badlands," which were largely economically depressed, African-American communities suffering from high-crime. His territory also included a segment of Fairmount Park which contained no business to solicit.[10]

Dawson says that he complained about his assignment to these territories "every day" in the second half of 2003 to Mayberry and Gagliardi.[11] Dawson was concerned that his assigned territories did not have sufficient business for him to meet his sales targets or earn a decent commission. He was also concerned that having largely African-American territories would make it difficult to sell advertising because of an on-going boycott effort in the minority community against the Philadelphia Daily News.[12] Dawson states that he was initially only concerned about the adequacy of his own territories, but after about a week, as he was able to compare other sales representatives' territories, he noticed that white employees appeared to have been assigned

racial animus.

[10]   Dawson 4/11/06 Deposition in Davis v. PNI, (Ex. B to Appx. to Pl. Br.) at 19; Dawson 3/21/07 Deposition (Ex. C to Appx. to Pl. Br.) at 152-53, 162-63.

[11]   Dawson 4/11/06 Deposition in Davis v. PNI (Ex. B to Appx. to Pl. Br.) at 25-27; Dawson 3/21/07 Deposition (Ex. C to Appx. to Pl. Br.) at 155-57, 165.

[12]   Dawson 3/21/07 Deposition (Ex. C to Appx. to Pl. Br.) at 82-85, 147-48, 150-152; Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.) at 308-10.

better, largely white territories, and minority sales
representatives had been assigned largely poorer, minority
areas.[13]

Dawson's supervisor, Michael Gagliardi, testified at
deposition that he and Dawson had conversations concerning "his
territory post redeployment and the ethnicity of his territory."
Daniel Baldwin, who became Dawson's direct supervisor after the
Plan became effective, testified at his deposition that he was
aware that Dawson had complained that his race had something to
do with the territory to which he had been assigned.  Baldwin
also testified that he had heard that Dawson was complaining
about the way Gagliardi was distributing sales leads.[14]

G.   Removal of Certain of Dawson's Accounts after the
     Reorganization

Dawson challenges PNI's decision to remove five of his
accounts as discriminatory.

1.   The Leisure Fitness Account

Leisure Fitness was one of Dawson's biggest accounts.
Dawson had acquired the account prior to the reorganization, and,

_____

[13]   Dawson 3/21/07 Deposition (Ex. C to Appx. to Pl. Br.)
at 147, 157-59.

[14]   Gagliardi Deposition (Ex. 16 to PMH Br.) at 25-26;
Baldwin Deposition (Ex. 15 to PMH Br.) at 23, 40.

because the company was based in Delaware and was therefore an "out of market" account, it was not reassigned during the reorganization.[15]

On October 12, 2004, Mayberry, at Leisure Fitness's request, removed Dawson from the account.  The account was reassigned to another representative, Patrick Hennessey, a white man.[16]

          a.    PNI's Description of Dawson's Handling of the Account

PNI has presented deposition testimony from Dawson's supervisors concerning a history of problems with Dawson's handling of the Leisure Fitness account.  Mayberry testified that his first interaction with Dawson and Leisure Fitness occurred because Leisure Fitness "had decided to stop advertising in our paper based on the relationship they had with [Dawson]." Mayberry testified he worked with Dawson to retain the account, and Leisure Fitness agreed to resume advertising in the paper, but that the contact at Leisure Fitness, Laura Bond, considered Dawson "on probation."[17]

---

[15]    Brennan Deposition (Ex. 23 to PHC Br.) at 21; Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.) at 238-39.

[16]    Mayberry Deposition in <u>Davis v. PNI</u> (Ex. 9 to PMH Br.) at 138.

[17]    Mayberry Deposition in <u>Davis v. PNI</u> (Ex. 9 to PMH Br.) at 138.

-13-

After this initial incident, there was a mistake concerning Leisure Fitness's advertising in the paper. Mayberry testified that either Laura Bond or her assistant called him and asked to have Dawson removed from the Leisure Fitness account. Mayberry testified that Bond or her assistant told him that she had given Dawson corrections to be made on a Leisure Fitness ad, but that those corrections were not made before the advertisement ran in the paper. Mayberry said that Leisure Fitness blamed Dawson and asked that he be removed from the account.[10]

In his deposition, David Baldwin, Dawson's supervisor, testified that he spoke to Laura Bond about Dawson and that she told him specifically that she wanted Dawson removed from the Leisure Fitness account. He testified that Bond told him that Leisure Fitness was having concerns about missing and misplaced ads and that Dawson was failing to address those concerns.[19]

b.   PNI's Written Warning

Baldwin sent Dawson a written warning on October 12, 2004, informing him that the Leisure Fitness account was being reassigned to another sales representative. In the warning, Baldwin states that "for the past few months" he had "seen a decline in [Dawson's] performance" and that "[Dawson's] ability

---

[10]     Id. at 138-39.

[19]     Baldwin Deposition (Ex. 15 to PMH Br.) at 26-27.

to manage the Leisure Fitness account has come into question on
numerous occasions over the last several months."  The warning
says that "[m]ost recently," Leisure Fitness had agreed to
"auction 10 items for the Bid & Buy campaign," but that Dawson
had failed to respond to repeated requests from Leisure Fitness,
Mayberry, and Baldwin to review proofs of the advertisements.
According to the warning, Dawson called Leisure Fitness after the
deadline for making changes had passed to tell them that changes
could still be made on PNI's online site, but was unable to give
Leisure Fitness the web address.[20]

The warning states that, at Leisure Fitness's request,
the account is being transferred to another sales representative.
The warning memo also says that "[d]ue to the seriousness of this
offense," PNI is dispensing with a verbal warning, the first step
in PNI's disciplinary process, and issuing a written warning,
which is the second step in the process.  The memo concludes that
failure to perform basic job responsibilities "will result in
further disciplinary action up to and including termination."[21]

---

[20]   October 12, 2007, Memo from Baldwin to Dawson (Ex. 24
to PMH's Br.).

[21]   Id.

c.   Dawson's Explanation of His Handling of the
     Account

Dawson does not dispute that Leisure Fitness requested

that he be removed from its account, although he says that PNI

has never shown him Leisure Fitness's written request that he be

removed.   Dawson also does not dispute that he did not tell

Leisure Fitness about the deadline for making changes to its

advertisements under the "Bid and Buy" program, although he

testified that he believes he was "set up" by Mayberry so that

the account could be taken from him.[22]

Dawson says that Mayberry told him that Mayberry had a

romantic interest, a "semi-crush," on Laura Bond, the client

contact at Leisure Fitness.   He states that, when Mayberry

accompanied Dawson on visits to Leisure Fitness, Mayberry

attempted to impress Bond by mentioning his own educational

accomplishments and derogating Dawson's.   Dawson says Mayberry

would criticize the grammar Dawson used in emails to Leisure

Fitness:   "He would call the account and apologize for my

ignorant writing and that I'm - we don't tolerate this at the

paper.   He would embarrass me and belittle me in front of the

_____

[22]   Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.)
at 217-18, 231, 233-34.

account to the point where he finally took the account, which I think he wanted from the very beginning."[23]

Dawson believes Mayberry then created a "set up" to provide an excuse to remove Dawson from the Leisure Fitness account. As part of a new program at the paper, accounts were to send "camera-ready" proofs of their advertisements to the paper. Dawson incorrectly believed that, because the work was "camera ready," the paper would make no changes before the ads ran. When Leisure Fitness submitted advertising proofs, someone at the paper made changes to the ads, which the client had not approved, and Dawson was blamed for failing to proof the advertising before it ran:

> The issue was not with Leisure Fitness, this was one of the racist policies which I [ ] talked about earlier. The issue was with Eric Mayberry setting me up to take the account away.
>
> This issue here with the Bid-and-Buy, all the information was in and we had – this was a new program or a new product at the time. The work came in camera ready. I was not told that the – once the work came in camera ready that the art department can change camera ready work around.
>
> Now the policy is at the paper if it came in camera ready, camera ready means its ready to go, it's not that the art department can change anything around, but they did. And when they changed it, I was not notified and

---

[23]   Dawson 4/11/06 Deposition in Davis v. PNI (Ex. B to Appx. to Pl. Br.) at 37-38; Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.) at 244-50.

> they sent out the proofs to the customer and
> I took the fall for it, and I told Eric
> [Mayberry] exactly what happened and he knew
> what happened, and he took the account anyway
> because he wanted to take the account because
> the account was making money at the time.[24]

Dawson says he believes that, although Mayberry was

also African-American, Mayberry's animus towards him was

motivated, at least in part, by race.  Dawson believes Mayberry

thought he was too unpolished to handle large accounts like

Leisure Fitness:

> "[Mayberry] thought that I could only
> correspond with accounts which were African
> American or Hispanic.  If the account was
> neither one of those races there, he didn't
> want me to - didn't think I had the skills,
> as he was saying, to communicate with them,
> only certain people such as himself and
> certain chosen people could.[25]

Dawson testified that Mayberry had similarly attempted

to undermine him with respect to another good account, Maloumian

Rugs, by questioning his competence:

> [Mayberry] started his own type of campaign
> to degrade me, ask Roy [the owner of
> Maloumian Rugs] was I the type of salesman
> that he wanted, was Linc okay, was he doing
> the job.  He was basically setting it up so
> he could give that to someone else also, but

---

[24]   Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.)
at 233-34; see also Dawson 4/11/06 Deposition in Davis v. PNI
(Ex. B to Appx. to Pl. Br.) at 40-41.

[25]   Dawson 4/11/06 Deposition in Davis v. PNI (Ex. B to
Appx. to Pl. Br.) at 39-40.

the owner told me exactly what I told him.
He told him I was doing a great job."[26]

Although Dawson admits that he failed to proof Leisure
Fitness's advertisements, he denies that he ever failed to return
phone calls to Leisure Fitness or that Mayberry or Baldwin ever
asked to review Leisure Fitness's proofs for the Bid-and-Buy
program. He also denies that he was ever asked by Leisure
Fitness for the website for the Bid-and-Buy program.[27]

Although Dawson does not dispute that Leisure Fitness
requested he be removed from its account, he believes that PNI's
acquiescence in that request was motivated by bias. Dawson says
that, on at least one other occasion, PNI had refused a customer
request to remove another sales representative, who was white,
from its account. Dawson suggests that this creates an inference
that PNI's acquiescence in Leisure Fitness's request was racially
motivated. Dawson has also produced copies of email
correspondence with Leisure Fitness employees from September and
October 2004 that show Dawson responding to Leisure Fitness
inquiries concerning pending advertising.[28]

---

[26]   Id. at 41-40.

[27]   Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.)
at 235, 241.

[28]   Dawson 4/4/07 Deposition (Ex. B to Appx. to Pl. Br.)
at 217-19; Email correspondence between Dawson and Bryanne Harris
of Leisure Fitness (Exhibit F to Pl. Appx.)

2.   The A-Plus Appliances Account

A-Plus Appliances was another of Dawson's accounts at
PNI.  It was located in Dawson's Micro-Zone.

PNI removed Dawson from the account at A-Plus
Appliances' request over a billing issue and replaced him with a
white employee.  Dawson does not dispute that he was removed at
the account's request or that A-Plus Appliances had a billing
issue that he was unable to resolve:

> The [A-Plus Appliances] account was a billing
> issue.  It was an account that I went out and
> obtained and that – it was a classified
> account and I was asking Mike [Gagliardi] to
> help me fix – because the billing was so
> wacky that I couldn't really get – they had a
> contract that was above my comprehension, I
> was asking Mike to help me fix this account.
> So me and Mike – then it got to the point
> where the account – I got Mike involved and
> the account was basically talking to Mike
> instead of talking to me and then the
> account, I guess, expressed to Mike that they
> didn't want to to do business with me no more
> and Mike took the account.[29]

Dawson contends that removing the A-Plus Appliances
account from him and giving it to a white employee was
discriminatory because when similar accounts were removed from
white sales representatives at the account's request, the
accounts were not reassigned to African-American employees.  In
particular, Dawson testified that an unnamed account told Dawson

---

[29]   Dawson 3/21/07 Deposition (Ex. C to Appx. to Pl. Br.)
at 170.

that it was unhappy with its existing PNI sales representative, a white employee named Dennis Ponnock, and would rather deal with Dawson, but when Dawson raised the possibility of having the account transferred to him with Gagliardi, Gagliardi refused to transfer it.[30]

### 3. The Bournmann Manufacturing Account

Dawson handled the Bournmann Manufacturing Account for PNI. PNI removed Dawson from the Bournmann account at Bournmann's request and reassigned the account to a white employee.

According to both the deposition and the affidavit of David Baldwin, Dawson's supervisor, "Bruce" from Bournmann Manufacturing complained to PNI that Bournmann's ads were not being placed correctly in the paper. Bournmann complained that, in some instances, wrongly-worded ads were being run; in other instances, a rightly-worded ad was being run on the wrong date or no ad was run at all. Bournmann also complained that Dawson would not return phone calls. Baldwin testified that Bournmann had provided him with a copy of a fax that supported its complaint that it had requested that Dawson place ads that were never placed. Baldwin states that he discussed these complaints with Dawson, who denied them, but that Dawson had no

---

[30]    Id. at 170-171

documentation to support his denial. Baldwin testified that, at the client's request, he removed Dawson from the Bournmann Manufacturing account and transferred it to Ray Groller, a white employee.[31]

In an email from Baldwin to Mayberry, Baldwin describes a telephone conversation he had with Bournmann, the owner of Bournmann Manufacturing. In the email, Baldwin says Bournmann complained that he had spent 15 hours over the last two weeks trying to resolve billing issues with Dawson and had placed 16 calls with Dawson that had not been returned. Baldwin says that Bournmann complained that his patience had run out and that he could not afford to do business with PNI unless he was assigned a new sales representative. Baldwin tells Mayberry that he recommends that a new representative be assigned to this account and that "[t]his incident must be documented with the others you have."[32]

Dawson, in his deposition, states that he generally remembers that there were billing issues with the Bournmann account, but that he does not remember specifics.[33]

_____

[31]    Baldwin Affidavit (Ex. 6 to PMH Br.); Baldwin Deposition (Ex. 15 to PMH Br.) at 34-36.

[32]    February 17, 2005 email from Baldwin to Mayberry (Ex. 29 to PMH's Br.).

[33]    Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.) at 250-55.

-22-

4.    The Columbus Vision Account

Dawson handled the Columbus Vision account for PNI.
David Baldwin, Dawson's supervisor, testified at deposition that
Dr. Columbus of Columbus Vision complained to him that he did not
want Dawson servicing his account because he believed that Dawson
had lied to him.  Dr. Columbus said that Dawson had told him that
Columbus Vision had placed an ad on a specific day, when in fact
it had not.[34]

Baldwin testified that he held a conference call with
Dr. Columbus and Dawson to discuss the incident.  During the
call, Dr. Columbus reiterated his belief that Dawson had lied to
him and Dawson reacted by leaving the room.  Baldwin testified
that Dawson provided no support for his statement that Columbus
Vision had placed an ad for a specific day.[35]

Baldwin states that, at the request of both Columbus
Vision and Dawson, Baldwin removed Dawson from the Columbus
Vision account.  The account was subsequently transferred to
Charlie Streeper, a Caucasian employee.[36]

Dawson, in his deposition, conceded that Columbus
Vision had been over-billed for advertising.  Dawson describes
Dr. Columbus as a "very irritable customer" and says he and

---

[34]    Baldwin Deposition (Ex. 15 to PMH Br.) at 40-41.

[35]    Id. at 42-43.

[36]    Id. at 44.

Baldwin had a conference call with Dr. Columbus to discuss the account.  He does not recall what Dr. Columbus said in that conference call.  He does not recall Dr. Columbus calling him a liar or Baldwin telling him that Dr. Columbus asked that he be removed from the account.[37]

### 5.   The Landmark Mechanical Account

Landmark Mechanical was another of Dawson's accounts. This account was removed from Dawson by PNI because of what PNI believed to be misconduct involving the account.

Baldwin, Dawson's supervisor, testified at deposition that he and Mayberry removed Dawson from the account after they discovered that Dawson had created a false account to allow Landmark Mechanical to purchase advertising in violation of PNI policy.  Landmark Mechanical was, at one point during Dawson's employment, banned from advertising with PNI because it owed PNI money.  Baldwin personally discovered that Dawson had set up a separate account under a related name "Mechanical Inc." with a separate address for the company (the building where Landmark Mechanical was located spanned a city block and therefore had two addresses).[38]

---

[37]     Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.) at 255-58.

[38]     Baldwin Deposition (Ex. 15 to PMH Br.) at 45-50; Baldwin Affidavit (Ex. 6 to PMH Br.).

Baldwin discovered the deception because he saw a Landmark Mechanical ad in the paper and questioned Dawson about it. He says that Dawson admitted that both the "Mechanical Inc." and Landmark Mechanical accounts were for the same company and that he had set up the separate account "to generate business." Baldwin and Mayberry then decided to remove the account from Dawson and give it to another commissioned sales representative. After the account was transferred to the other representative, Landmark Mechanical paid their past due bill and was once again able to buy advertising.[39]

Dawson stated at deposition that he had no recollection of setting up two accounts for Landmark Mechanical. Dawson said that one business may have separate accounts when they have separate locations. He also testified that a PNI sales representative could open an account for a business and run an advertisement for it, even if the business lacked good credit, as long as the business paid for the advertisement in advance. Dawson testified that he could not recall why the Landmark Mechanical account was transferred to another representative.[40]

---

[39]    Id.

[40]    Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.) at 260-265.

H.   Dawson's Difficulties Meeting His Revenue Goals After
the Reorganization, His Complaints about PNI's Sales
Support, and His January 2005 Meetings with Management

1.   Revenue Goals and Probation

Every PNI sales representative, including Dawson, was
required to meet revenue goals.  These revenue goals were
developed by PNI's Advertising Expense Supervisor, Dan Britton.
Britton calculated these goals using a computer program that
applied an algorithm to historical data showing the amount billed
over the same period in the prior year.  When sales
representatives fail to meet their revenue goal, they were sent a
"Probation Memorandum" which told them, among other things, that
a possible consequence of continuing to fail to meet revenue
goals could be termination.

The summary judgment record contains probation
memoranda sent to Dawson.  On June 10, 2004, Dawson was sent a
probation memorandum stating he had failed to meet his revenue
goal for "at least two successive periods" and that he had
achieved only 31% of his revenue goals for "period 5."  On July
7, 2004, Dawson was sent a probation memorandum showing he had
only met 65% of his revenue goal for "period 6."  On August 18,
2004, he received another probation memorandum stating that he
had only met 24% of his revenue goal for "period 7" and that he
had now missed his goal for 4 successive periods.  He received
another probation memoranda on January 13, 2005, stating that he

-26-

had only met 78% of his goal for period 12 and had missed his goal for two successive periods.[41]

## 2.   Dawson's Sales Efforts and PNI's Sales Support

The parties sharply dispute the amount of effort Dawson was putting forward to service his territories and the level of sales support that PNI provided to him. Gagliardi, the Daily News Sales Supervisor, testified at deposition that he discussed Dawson's performance issues with him and told him that he could do a better job. Gagliardi felt Dawson was not making enough phone calls and seeing enough people.[42]

At his probation meetings, Dawson was asked whether he had called all the listed businesses in his territories. He said he had not because there were too many to call and because they were mainly "mom-and-pop" stores that were not likely to purchase advertising. He said he had called "a significant number of bigger accounts." Dawson testified that Baldwin and Mayberry unreasonably refused to give him additional zip codes until he proved he had called all the stores in his territory, although he conceded they did ultimately give him more zip codes.[43]

---

[41]   Probation Memoranda (Ex. 31 to PMH Br.)

[42]   Gagliardi Deposition (Ex. 16 to PMH Br.) at 50-51.

[43]   Defendant's Statement of Undisputed Facts and Plaintiff's Answer at ¶ 53; Dawson 4/11/06 Deposition in <u>Davis v. PNI</u> (Ex. B to Appx. to Pl. Br.) at 81-82.

Dawson concedes that PNI added additional zip codes to his territory in both 2003 and 2005. In late 2003, after Dawson repeatedly complained about the territory he had been assigned under the reorganization, Mayberry assigned him two more sections of Germantown and Mount Airy. Subsequently, in 2005, after Dawson continued to complain about his territory, Mayberry gave him five additional zip codes. No other additional representative received as many additional zip codes as Dawson. Mayberry also agreed to give Dawson the right to sell across territories in the auto aftermarket.[44]

At his probation meetings, Dawson complained about the territory to which he'd been assigned. Dawson asked his supervisors, in particular Daniel Baldwin, to meet him in his territory so that they could see the difficulties he was having making sales. Dawson testified that Baldwin never met him to visit his territory. Dawson conceded that, in August 2004, after Dawson had received probation memoranda concerning his missed sales targets, Eric Mayberry did join him for a day making sales calls. Mayberry, Gagliardi, and Baldwin all testified that they

---

[44]     Mayberry Deposition in <u>Davis v. PNI</u> (Ex. 9 to PMH Br.) at 112-13; Dawson 4/11/06 Deposition in <u>Davis v. PNI</u> (Ex. B to Appx. to Pl. Br.) at 25-27; January 10, 2005, letter from David Vidovich to Bill Ross; Baldwin Affidavit (Ex. 6 to PMH Br.) at ¶ 9.

had accompanied Dawson on sales calls to help him obtain business, sometimes at his request, sometimes at their own.[45]

### 3. The January 2005 Union Grievance

Dawson filed a grievance in December 2004 or January 2005 with his union over the written warning he received concerning his handling of the Leisure Fitness account. In his list of grievances, submitted to PNI on January 4, 2005, Dawson complained, among other things, that he had received only a 5% commission for Leisure Fitness business for November 2004 instead of the agreed upon 8% and that PNI would not allow him to call Leisure Fitness to find out why he lost the account.[46]

Dawson also complained in his grievance about the quality of the territories assigned to him and the other African-American commissioned sales representatives. In his grievance, Dawson complains that he received no transferred accounts in the 1.5 years since the redeployment and only two leads from management, while other sales representatives received more. He complains that more than half of the clients in his territories

---

[45]    Dawson 4/11/06 Deposition in Davis v. PNI (Ex. B to Appx. to Pl. Br.) at 64, 78-80; Dawson 3/21/07 Deposition (Ex. C to Appx. to Pl. Br.) at 177; Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.) at 300-01; Mayberry Deposition in Davis v. PNI (Ex. 9 to PMH Br.) at 99; Baldwin Deposition (Ex. 15 to PMH Br.) at 23-24; Gagliardi Deposition (Ex. 16 to PMH Br.) at 18-19.

[46]    January 4, 200[5], List of Grievances (Exhibit 26 to PMH Br.).

are non-English-speaking, which makes them difficult to service, and that one of his zip codes includes Fairmount Park where there is no business. He states that he was given all minority zip codes during a time when there was an on-going boycott of the Daily News and that new sales representatives, primarily Caucasian, receive all the favorable zip codes and transferred accounts. He concludes by saying he "would like the opportunity to move to a different department and says he has not received a paycheck for the past month because of deductions from the "paybacks" on the Leisure Fitness account and another account.[47]

At deposition, Dawson stated that he emailed PNI's head of human resources, David Vinovich, in January 2005 about his complaints, and subsequently met with Vinovich and his union representative. It is not clear from Dawson's testimony whether this email and Dawson's subsequent meeting with Vinovich were part of the grievance process. Dawson says he told Vinovich that accounts, particularly Leisure Fitness, had been taken from him unfairly. He complained that PNI had acted differently when a different account serviced by a white sales representative, David Ponnock, had requested that the representative be removed from its account. Dawson said, in that instance, PNI had refused to remove Ponnock from the account. Dawson also said that he was not receiving credit for all the commissions he was due on the

---

[47]   Id.

-30-

Leisure Fitness account before it was taken from him.  Dawson
also complained more generally about what he believed to be a
racist attitude at PNI.[48]

To resolve Dawson's grievance, PNI agreed to expunge
the written warning it had given Dawson and agreed to increase
the compensation that Dawson was paid on Leisure Fitness's
advertising during the time the account was transferred.  In a
January 10, 2005, letter to Dawson's union, memorializing PNI's
response to the grievance, PNI's Vice President of Human
Resources, David Vidovich, says that Dawson raised issues
concerning "equitable treatment" and "territory size and scope"
at his grievance meeting and that PNI is committed to "assuring
that Linc is treated equitably within the department" and that
"accounts that should be in his territory reside as such and
transfers are handled as such."  Vidovich concludes by saying
that Mayberry has added "additional territory, five zip codes and
the right to sell across territories in the auto aftermarket to
Linc's responsibility" and that it will investigate the "other
issue of equity."[49]

_____

[48]     Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.) at
198-99, 204-08, 216-19.

[49]     Pl. Stat. of Facts at ¶ 66; January 10, 2005 Letter
from David Vidovich to Bill Ross of the Newspaper Guild of
Greater Philadelphia (Exhibit 25 to PMH Br.)

PNI held a meeting with Dawson in February 2005 to discuss the more general issues of racism he had raised in January. This meeting was between Dawson and Chris Bondanducci, Senior Director of Human Resources. At this meeting, Dawson told Bondanducci exactly how he felt about PNI and its treatment of him, that he thought it was an extremely racist organization, and that physically and mentally he could not stand working there.[50]

### 4. The January 2005 Performance Review

Dawson had a January 2005 Performance Review with David Baldwin to go over his 4th Quarter 2004 Performance. At that meeting, Dawson says he told Baldwin that PNI was racist and complained about not receiving additional territories. Dawson said he was having trouble making ends meet because not all his credits were coming through. He recalls Baldwin trying to set him up with the computer sales tool, Citrix, but says he never followed up because by that time he was seeking other employment.[51]

In a January 27, 2005, memorandum from Baldwin to David Vidovich and Eric Mayberry reporting on the meeting, Baldwin says

---

[50]    Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.) at 208-10.

[51]    Dawson 4/11/06 Deposition in <u>Davis v. PNI</u> (Ex. B to Appx. to Pl. Br.) at 86-87; Dawson 4/4/07 Deposition (Ex. C to Appx. to Pl. Br.) at 266-67, 268; Bondanducci Affidavit (Ex. 2 to Pl. Br.)

-32-

that Dawson made his overall 4th Quarter goal and that, although he was below his goals in November and December, he earned over twice his goal in October. Baldwin also says that Dawson argued he should have received credit for the Leisure Fitness settlement in his November figures and, if that were added in, he would also have made his goals for November.[52] The memo states that Baldwin asked Dawson about his "prospecting methods" and Dawson told him that he had not developed an "action plan." Baldwin asked Dawson to prepare such an action plan and to pull computer reports concerning the accounts he was pursuing.[53]

According to the memo, when Baldwin emphasized to Dawson the importance of teamwork, Dawson said that he did not feel part of the team because the team had pushed him away. Baldwin told Dawson that, in his opinion, Dawson had pushed the team away, and had failed to comply with basic team requirements, like returning phone calls, responding to emails, and attending team meetings. Dawson responded by saying that he was dealing with personal issues related to a divorce from his wife and could not afford to come into work. The memo states that Baldwin proposed that Dawson be set up to access PNI's computer network

---

[52]   January 27, 2005 Memo from Baldwin to Vidovich and Mayberry (Ex. 32 to PMH Br.).

[53]   Id.

from home and that a technician would contact Dawson to arrange this.

## I.    Incidents of Racial Harassment

Dawson's complaint alleges, without elaboration, that he was subjected to "racial harassment" at PNI.  Dawson's opposition to summary judgment does not discuss the evidence in support of this claim, but instead offers only a conclusory statement that sufficient evidence exists to prevent summary judgment.  At oral argument, Dawson's counsel for the first time mentioned racial comments by Gagliardi, Dawson's supervisor, and by another sales representative.  Dawson's counsel asserted that Dawson had testified to these incidents at deposition, but counsel could not provide detail or specific citations.

Although the plaintiff's failure to cite to Dawson's deposition testimony in his opposition brief, and his counsel's failure to provide specific citations at oral argument to the relevant testimony in his two depositions, would justify not considering this evidence on summary judgment, the Court will nonetheless consider it.  The Court has reviewed Dawson's depositions and has found the portions referred to by his counsel where Dawson testifies as to racially offensive comments by other PNI employees.

Dawson testified that his supervisor, Gagliardi, would joke about Dawson's territory in North Philadelphia in ways that

Dawson believed were racist.  Gagliardi "used to laugh about my
territory, that he would never go down there.  This is Mike
Gagliardi, I would never go down there, I might not make it out,
things of that nature."  Dawson testified that he interpreted
Gagliardi to be saying "I'm white, I don't go the hell down
there, but I want you to make a living down there."[54]  In his
second deposition, Dawson again mentioned Gagliardi's comments
that he did not want to go into certain areas of Dawson's
territory, but was unwilling to characterize those comments as
racist:

> The only other things were I talked to Mike a
> couple of times and he said that certain
> accounts in certain areas, that he didn't
> want to go into those areas with me.  I don't
> think that's  - but that's about it.  I don't
> know if that's racist or not, that's just -
> basically those areas were pretty rough.[55]

Dawson also testified that a PNI sales representative
named Ray Groller repeatedly made racially offensive comments
about Asians and African-Americans in employee meetings:

> Ray was a salesman.  He would be in meetings.
> He would make fun of oriental people, he
> would make fun of black people; he would make
> fun of anyone who was not of his persuasion,
> which was Caucasian, and he would do it right
> in the meeting, like call a Chinese person a
> dirty chink.  He called - one time he said a

---

[54]   Dawson 4/11/06 Deposition in <u>Davis v. PNI</u> (Ex. B to
Appx. to Pl. Br.) at 63-64.

[55]   Dawson 3/21/07 Deposition (Ex. C to Appx. to Pl. Br.)
at 196-97.

> gook.  Then he mentioned something in regards
> to blacks, but he would kind of — I can't
> remember exactly what he said, something
> about monkeys, he mentioned monkeys.  He
> thought it was funny.  I can't remember
> exactly all what he said now I just remember
> these little points.[56]

In a later deposition, Dawson testified that Groller also at one time "made a racist statement about spooks . . . he said it loud and he said it right across the salesroom."  Dawson testified Groller also referred to Asians as "slant eyed bastards" in a sales meeting.[57]

Dawson testified that he complained about Groller's comments about African-Americans by sending an email to David Baldwin.  (Dawson's testimony is somewhat unclear as to exactly which comments were the subject of his complaint.  In his April 2006 deposition, he says he wrote Baldwin about the "monkey" epithet; in his March 2007 deposition, he says he wrote Baldwin about the "spook" epithet.  It is unclear if these were the same incident.)  Dawson testified Baldwin responded by telling him that "that's Ray being Ray" and that Ray was a "good guy," but that he would ask Ray to apologize.  Dawson testified that, after Baldwin spoke to him, Ray Groller did apologize to him for the comment but he does not know whether Groller apologized to other

---

[56]     Dawson 4/11/06 Deposition in Davis v. PNI (Ex. B to Appx. to Pl. Br.) at 51-52.

[57]     Dawson 3/21/07 Deposition (Ex. C to Appx. to Pl. Br.) at 180-81, 184-85.

PNI employees.  Dawson testified that Groller was never disciplined or asked to apologize for the comments about Asians.[58]

### J.   Dawson's Resignation from PNI

Dawson has conceded that by January 30, 2005, he had begun, without PNI's knowledge, to work a second job.  Although Dawson did not leave the company until March 2005, he testified that "unofficially, I left at the end of January."[59]

Dawson resigned from PNI on February 21, 2005, effective March 8, 2005.  In his February 21 email, Dawson says he is resigning "due to my not making enough money to pay my living expenses."  That same day, Mayberry forwarded Dawson's email to David Vidovich and others, adding the comment that "Performance management works.  Linc has resigned."[60]

## II.  Legal Argument

Dawson has brought his claims under 42 U.S.C § 1981. He alleges he suffered discrimination because of his race and

---

[58]     Dawson 4/11/06 Deposition in <u>Davis v. PNI</u> (Ex. B to Appx. to Pl. Br.) at 52-54, 89; Dawson 3/21/07 Deposition (Ex. C to Appx. to Pl. Br.) at 180-85.

[59]     Pl. Stat. of Facts at ¶ 122.

[60]     February 21, 2005 email from Dawson to Mayberry (Ex. 33 to PMH Br.).

suffered retaliation after he complained of racially disparate treatment.  He also alleges that he was constructively discharged and that he was subjected to racial harassment and a hostile work environment.

A.   Dawson's Discrimination Claims

The elements of a section 1981 discrimination claim are identical to those for a similar claim under Title VII.  Schurr v. Resorts Int'l Hotel Inc., 196 F.3d 486, 499 (3d Cir. 1999). Title VII cases are governed by the burden-shifting framework set out in McDonnell Douglas v. Green, 411 U.S. 792 (1973).

To establish a prima facie case of discrimination, a plaintiff must show:  (1) that she is a member of a protected class; (2) that she was subjected to an adverse employment action; and (3) that similarly situated members of other racial classes were treated more favorably or that other circumstances exist that give rise to an inference of unlawful discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410-12 (3d Cir. 1999).

Once the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the alleged adverse action.  This "relatively light" burden requires the defendant to introduce evidence, which if taken as true, would permit the

-38-

conclusion that there was a nondiscriminatory reason for the challenged action.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).  If the defendant comes forward with such reasons, then the burden shifts back to the plaintiff to prove that the reasons proffered by the defendant were pretextual.  Id.

To show that an employer's reasons are pretextual, it is "not enough for a plaintiff to show that the employer's decision was wrong or mistaken," but instead a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasons that a reasonable factfinder could find them "unworthy of credence." Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 283 (3d Cir. 2001) (citations omitted).  To do so, the plaintiff must point to "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764; see also Atkinson v. La Fayette College, 460 F.3d 447, 454 (3d Cir. 2006).

Dawson has claimed that PNI discriminated against him in three different ways:  in assigning him his territory under the reorganization Plan; in failing to give him adequate sales

-39-

assistance after the reorganization; and in removing certain accounts from him.[61]

      1.   The Assignment of Territories Under the Plan

      Dawson's counsel conceded at oral argument that Dawson could not prove that the method that PNI used to assign Dawson to his new territories in its reorganization was racially discriminatory.  Dawson's counsel also conceded that he could not produce evidence to dispute PMH's showing that PNI's creation and assignment of zip-code-based territories under the reorganization Plan was based on neutral, non-racial criteria.[62]

      It is undisputed that the territories assigned under the Plan were created by a committee that relied on historical data about the past revenue generated in each zip code to create territories that had historically generated between $200,000 to $400,000 a year in advertising revenue.  It is also undisputed that the territories were assigned by Mayberry to sales representatives who had pre-existing accounts in those territories and that Dawson was assigned a territory in which he had more pre-existing accounts than other sales representatives. Although Dawson's revenue dropped 6% in the six months after implementation of the Plan as compared to the six months before

---

[61]    1/30/08 Tr. of Oral Arg. at 5-10.

[62]    1/30/08 Tr. of Oral Arg. at 22-26.

the Plan, Dawson has not disputed the report of PMH's expert who found that, across all African-American commissioned representatives, there was no statistically significant change in revenue for the 12 months before and after the Plan's implementation.

Dawson argues that he can nonetheless make out a claim of discrimination because the earning potential of his territory was lower than that of other sales representatives. Dawson argues that, even if the amount of advertising revenue historically generated from his territory was comparable to that of other territories, the potential for that revenue to grow was diminished in his territory compared to others, because his territories were primarily economically depressed areas with small "mom and pop" accounts.

Dawson, however, offers no support for this argument other than his own testimony about the economic characteristics of his territory and the fact that he had difficulties meeting his sales targets. Dawson speculates that, because his territory included poorer neighborhoods than those of other sales representatives, the growth potential of his territory was diminished, but he offers no evidence to quantify that growth potential or to compare his territory's growth potential to that of other sales representatives. Having produced no evidence that his territory had a lower potential for revenue growth than those

-41-

assigned to other sales representatives, much less other white
representatives, Dawson has failed to make out a prima facie case
of discrimination regarding the assignment of his territories.

### 2.    The Sales Assistance Offered Dawson

Dawson has pointed to a variety of instances in which
he claims that he did not receive adequate sales assistance from
PNI:  "either providing leads to him, assisting him in developing
his existing business, or responding to what may have been
concerns in developing his existing business."[63]  It is unclear
from the plaintiff's complaint, briefing, and oral argument,
whether the plaintiff is contending that these incidents are
sufficiently severe, in and of themselves, to constitute adverse
employment actions giving rise to a claim for discrimination, or
whether the plaintiff is contending that these incidents, while
not severe enough by themselves to be actionable, should be
considered along with other instances of alleged discrimination
as part of Dawson's constructive discharge or hostile work
environment claims.  If the plaintiff is arguing the former, the
Court finds that the plaintiff has not made out his prima facie
case.

To support a prima facie claim of discrimination based
on these incidents of inadequate sales support, the incidents

---

[63]    1/30/08 Tr. of Oral Arg. at 7.

-42-

would have to be sufficiently severe to constitute "adverse
employment actions." Jones, 198 F.3d at 411.  An adverse
employment action is one that is "serious and tangible enough to
alter an employee's compensation, terms, conditions, or
privileges of employment." Cardenas v. Massey, 269 F.3d 251, 263
(3d Cir. 2001) (quoting Robinson v. City of Pittsburgh, 120 F.3d
1286, 1300 (3d Cir. 1997)).  Examples of actions that have been
found to sufficiently serious and tangible to constitute adverse
employment actions include terminations, transfers, demotions and
changes in job responsibilities or compensation.  Jones, 198 F.3d
at 411.

         Some of the lack of sales support Dawson experienced
would seem to fall short of the severity needed to constitute an
adverse employment action.  Dawson's principal complaints are
that PNI failed to accommodate his requests to have additional
zip codes added to his sales territory and that PNI managers
failed to accompany him on sales calls to appreciate the
difficulties of selling in his existing territories.  Dawson also
complains that PNI managers failed to assign him his fair share
of accounts given up by other sales representatives when they
left the company.

         The allegation that PNI managers failed to accompany
Dawson on sales calls does not describe a change in the terms and
conditions of Dawson's employment and therefore falls short of an

adverse employment action.  Dawson's other complaints present a
closer question.  Because Dawson was paid a commission on his
sales, it is a reasonable inference that Dawson's compensation
was affected by PNI's alleged failure to add zip codes to his
sales territories and its alleged failure to assign him a fair
share of sales leads.  For purposes of summary judgment, these
actions therefore are sufficient to constitute an adverse
employment action affecting the terms and conditions of his
employment.

Even as to these actions, however, Dawson has failed to
make out his prima facie case because he has failed to come
forward with evidence to suggest that PNI's failures to give him
additional zip codes or assign him sales leads were motivated by
racial discrimination.  Dawson conceded in his deposition
testimony that PNI added additional zip codes to his sales
territory in 2003 and again in 2005.  Dawson has not disputed
PMH's assertion that he was given more additional zip codes than
any other PNI sales representative, nor has he pointed to any
white sales representatives who were given additional zip codes
when Dawson was not.  Concerning the reassignment of sales leads
from departing employees, Dawson's only evidence that these leads
were assigned unfairly is his own testimony that they were never
given to him.  Dawson's testimony does not identify any
particular departing sales representative whose leads he contends

-44-

were unfairly assigned, or identify the sales representatives who received those leads.

### 3.    The Removal of Accounts from Dawson

Dawson contends that PNI discriminated against him by removing him from five of his accounts:  Leisure Fitness, A-Plus Appliances, Bournmann Manufacturing, Columbus Vision, and Landmark Mechanical.

PMH does not challenge whether Dawson has made out a prima facie case of discrimination concerning the removal of these accounts, but instead advances what it contends are legitimate non-discriminatory reasons for their being reassigned.

PMH has produced evidence that four of the five transferred accounts – Leisure Fitness, A-Plus Appliances, Bournmann Manufacturing, and Columbus Vision – requested that Dawson be removed as PNI's sales representative for their accounts.  Concerning the fifth, Landmark Mechanical, PMH produced testimony that Dawson acted improperly by creating a fictitious account to allow Landmark Mechanical to purchase advertising when it had not paid its past due bills and that the Landmark Mechanical account was transferred from Dawson as part of the discipline he received for this infraction.

PMH's showing is sufficient to meet its "relatively light" burden of putting forward a legitimate non-discriminatory

-45-

reason for removing these accounts. The burden therefore shifts to Dawson to produce evidence of pretext, either by casting doubt on PMH's proffered reasons or presenting evidence that PMH's actions were more likely than not motivated by discrimination.

Dawson has not sought to cast doubt on PMH's reasons for removing four of the five challenged accounts. Dawson concedes that the managers of A-Plus Appliances, Bournmann Manufacturing, and Columbus Vision each asked to have Dawson removed as their sales representative. Dawson also has not presented any evidence to contradict PMH's explanation that Dawson was removed from the Landmark Mechanical account because he created a duplicate of that account to evade a credit hold.

The only evidence of pretext that Dawson has put forward with respect to these accounts is his deposition testimony that PNI refused to remove an account from a white representative, Dennis Ponnock, after the account had requested that Ponnock be removed. Dawson's testimony provides no detail concerning this incident and does not explain why the account requested that Ponnock be removed and why PNI refused the request. Without this information, the Court cannot determine whether the Ponnock incident is sufficiently similar to the removals of Dawson's accounts to raise an inference of discriminatory treatment. The Court cannot determine, for example, whether Ponnock's account's reasons for wanting him

-46-

removed were baseless, or whether, like the complaints of
Dawson's accounts, they were based on specific and uncontested
instances of customer dissatisfaction with the representative's
performance.  Absent these details, Dawson's testimony about
Ponnock does not provide a reasonable basis for a fact finder to
either disbelieve PNI's reasons for removing these accounts from
Dawson accounts or believe that PNI's real motivation for doing
so was discrimination.

          Dawson makes a greater attempt to show pretext with
respect to the removal of the remaining account at issue, Leisure
Fitness.  This account was removed from Dawson after the client
complained about Dawson's repeated refusal to return phone calls
and his failure to make requested changes to advertising proofs,
resulting in incorrect advertisements being run in the paper.
Dawson argues this explanation is pretextual and states that Eric
Mayberry, his supervisor, engineered a "set up" to remove the
account from him and give it to a white employee.

          Although Dawson concedes that incorrect Leisure Fitness
advertisements were run in the paper, he argues that this was not
his fault because he was not told that "camera-ready" advertising
submissions could be altered by the art department.  Although
Dawson concedes that Leisure Fitness requested that he be removed
from its account, he suggests that this was at the instigation of
Eric Mayberry.  Dawson contends that Mayberry had a romantic

-47-

interest in the Leisure Fitness employee responsible for his account and, although he does not say so directly, implies that Mayberry was able to use this relationship to induce Leisure Fitness to complain about Dawson's handling of his account. Dawson denies he failed to return Leisure Fitness's phone calls or was otherwise inattentive to the account.

Dawson's arguments are insufficient to create a genuine issue of material fact over the removal of the Leisure Fitness account. Other than Dawson's bare assertion of being "set up," the only fact Dawson presents in support of his pretext argument is the alleged romantic interest between Mayberry and the Leisure Fitness manager, for which the only evidence is Dawson's deposition testimony. This is not enough to "meaningfully throw into question" PMH's proffered reasons for removing the Leisure Fitness account, particularly since Dawson concedes both that incorrect Leisure Fitness advertisements ran in the paper after he failed to proof them and that Leisure Fitness consequently requested that Dawson be removed from its account.

### B.    Dawson's Retaliation Claims

Retaliation claims under 42 U.S.C. § 1981 have the same elements and are subject to the same burden-shifting analysis as Title VII claims. Cardenas, 269 F.3d at 263; Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).

-48-

To establish a prima facie case for discriminatory retaliation under 42 U.S.C. § 1981, a plaintiff must show that: (1) she engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217, 231-232 (3d Cir. 2007). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action, and once this "relatively light" burden is met, the plaintiff must then come forward with evidence to establish that the proffered reason is pretextual and that the real motivation for the challenged action was discrimination.  Woodson, 109 F.3d at 920 n.2.

At oral argument, Dawson's counsel clarified that, although there were scattered references in the summary judgment record alluding to Dawson's making complaints to managers about racial discrimination earlier than his December 2004-January 2005 union grievance, for purposes of defending Dawson's retaliation claim from summary judgment, Dawson was contending that his January 2005 grievance and the related communications with management were his first instance of protected activity.[64] Dawson identified the adverse employment actions taken against

_____

[64]   1/30/08 Tr. of Oral Arg. at 10-13.

him after the January 2005 grievance as 1) his removal from the Bournmann Manufacturing account and 2) the "ratcheting up" of PNI's performance management process concerning Dawson's job performance.[65]

Dawson's has failed to raise a genuine issue of material fact concerning his retaliation claims over the removal of the Bournmann Manufacturing account because PMH has come forward with a legitimate, nondiscriminatory reason for its action that Dawson has failed to rebut. As discussed above in connection with Dawson's discrimination claims, PMH produced evidence that Bournmann Manufacturing requested that Dawson be removed from its account after he failed to respond adequately to its complaints over billing errors and incorrect advertisements. Dawson has not presented evidence sufficient to cast doubt on PNI's explanation for his removal or to allow a reasonable factfinder to conclude the account was removed because of retaliation.

Dawson has also failed to make out a retaliation claim concerning the alleged "ratcheting up" of PNI's performance management process. Dawson failed to provide specifics either in his briefing or at oral argument as to what exactly he contends constituted "ratcheting up." A review of the record shows that after Dawson filed his grievance in January 2005, PNI agreed to

_____

[65]     Id. at 13-14.

-50-

settle the grievance by expunging the written warning it had
given him, increasing compensation he was owed for past sales to
the Leisure Fitness account, and adding five new zip codes to his
sales territory.  PNI also arranged a meeting with a human
resource executive to discuss his complaints about racial equity
in the company.  Also in January, PNI held a performance review
with Dawson to go over his 4th Quarter 2004 results.  At the
review, Dawson was instructed to prepare an action plan to
improve his performance and was offered home access to PNI's
computer system so he could work from home.

     None of these actions rises to the level necessary to
constitute an adverse employment action.  To constitute
actionable retaliation, an employer's action must be "materially
adverse," meaning that it "might have dissuaded a reasonable
worker from making or supporting a charge of discrimination."
Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53,
68 (2006) (internal quotation and citation omitted).  Nothing in
PNI's performance management process in January and February 2005
is sufficiently adverse to meet this standard.

### C.   Dawson's Constructive Discharge Claims

     A plaintiff may bring constructive discharge claims
under 42 U.S.C. § 1981.  Jones, 198 F.3d at 412.  The standard
for determining whether a constructive discharge has occurred is

an objective one, requiring "a finding that the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." Goss v. Exxon Office Sys. Co. , 747 F.2d 885, 887-88 (3d Cir. 1984).

To state a prima facie case for constructive discharge, a plaintiff must therefore proffer evidence showing the defendant created sufficiently unpleasant or difficult conditions that a reasonable person would resign. Jones, 198 F.3d at 412. Once this showing is made, the burden shifts to the defendant to proffer legitimate nondiscriminatory reasons for those conditions, and then to the plaintiff to show that such reasons are pretextual. Id.

Here, PMH argues that Dawson cannot establish that he was constructively discharged because Dawson was not subjected to discipline any different from that of his co-workers, citing Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992) (noting that constructive discharge results from calculated efforts by an employer to pressure an employee to resign by subjecting them to unreasonably harsh conditions "in excess of those faced by her co-workers). PMH also relies on Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1992), where the court set out several "factors" that had been held to justify a finding of constructive discharge in other cases. These

-52-

factors included threatening an employee with discharge, urging or pressuring an employee to resign, demoting an employee, reducing an employee's pay or benefits, involuntarily transferring an employee to a less desirable position, detrimentally altering an employee's job responsibilities, or giving unsatisfactory job evaluations. Id.

PMH contends that the only Clowes factors that apply to Dawson are a reduction in pay or an involuntary transfer of accounts. PMH says, even if those factors could support a claim for constructive discharge, it has advanced legitimate non-discriminatory reasons for Dawson's loss of income and the transfer of certain of his accounts. Dawson responds that he was also threatened with termination in PNI's October 2004 memo disciplining him for his handling of the Leisure Fitness account. Dawson also contends he was subjected to a campaign of harassment designed to get him to resign, pointing to Mayberry's February 28, 2005, email forwarding Dawson's letter of resignation, in which he states that "Performance management works. Linc has resigned."

The Court finds that Dawson has made out his prima facie case for constructive discharge. The removal of large accounts can be sufficient to constitute constructive discharge. See Goss, 747 F.2d at 888 (an employer's threat to remove a large account from the plaintiff and the subsequent transfer of the

-53-

plaintiff to a new territory was sufficient to support a finding of constructive discharge).  The transfer of several of Dawson's accounts, particularly Leisure Fitness, and the accompanying drop in Dawson's income is enough, taking every inference in Dawson's favor, to make out a prima facie case of conditions so unpleasant or difficult as to force him to resign.[66]

As discussed above in connection with Dawson's discrimination claims, however, PNI has presented legitimate, non-discriminatory reasons for removing these accounts from Dawson, and Dawson has failed to come forward with sufficient evidence to rebut those reasons.  Because the removal of these accounts and the concomitant loss of income is the basis for Dawson's prima facie case, Dawson's failure to rebut PMH's nondiscriminatory reasons for removing them is fatal to his constructive discharge claim.[67]

_____

[66]    There is some conflicting evidence as to how much Dawson's earnings had decreased by early 2005.  The January 27, 2005 Memo from Baldwin to Vidovich and Mayberry (Ex. 32 to PMH Br.), concerning Dawson's performance evaluation says Dawson met his revenue targets for the 4th Quarter of 2004, which would presumably have resulted in substantial commissions, but the memo also says that Dawson was complaining at that time that he had no money.  Taking the evidence in the light most favorable to Dawson, and resolving the conflict in his favor, the memo is evidence of Dawson facing financial hardship before he resigned.

[67]    Dawson's additional allegations that he was threatened with termination and subjected to a campaign of harassment to induce him to resign do not affect this conclusion.  Dawson characterizes as a termination threat PNI's statement in its October 2004 memo removing Dawson from the Leisure Fitness account that further failures to perform could result in "further

-54-

D.    Dawson's Racial Harassment Claims

Claims for racial harassment in the workplace, also referred to as racially hostile work environment claims, may be brought under 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1992, the statute under which Dawson has brought this action.  The elements of a hostile work environment claim under § 1981 are the same as the elements for a hostile work environment claim under Title VII.  Manatt v. Bank of Am., 339 F.3d 792, 797 (9th Cir. 2003); see also Third Circuit Model Jury Instruction 6.1.3 and the comment thereto (citing Verdin v. Weeks Marine Inc., 124 Fed. Appx. 92, 94 (3d Cir. 2005) and Ocasio v. Lehigh Valley Family Health Ctr., 92 Fed. Appx. 876, 879-80 (3d Cir. 2004)).

To establish a hostile work environment claim, a plaintiff must show 1) that he or she suffered intentional discrimination because of race; 2) that the discrimination was

---

disciplinary action up to and including termination."  The Court has found that PMH had legitimate, nondiscriminatory reasons for disciplining Dawson for his handling of the Leisure Fitness account, and those same reasons justify PNI's warning that similar actions in the future might result in Dawson's termination.  Dawson's contention that he was subjected to a campaign of harassment is unsupported by the summary judgment record.  As discussed above in evaluating Dawson's retaliation claims, nothing in PNI's actions towards Dawson in January and February 2005 before he resigned could be considered a "campaign of harassment."  In that time, PNI expunged his written warning over Leisure Fitness, increasing his past due compensation owing on the Leisure Fitness account, and added new zip codes to his sales territory.

pervasive and regular; 3) that the discrimination detrimentally affected the plaintiff; 4) that the discrimination would detrimentally affect a reasonable person of the same protected class in that position; and 5) that there is a basis for vicarious or respondeat superior liability. Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996). In evaluating a hostile work environment claim, a court must consider the totality of the circumstances, rather than just individual incidents, and must be mindful that isolated incidents, unless extremely serious, and offhand comments are not sufficient to sustain a claim. Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005).

In support of his hostile work environment claim, Dawson points to racial comments he says were made by his supervisor Michael Gagliardi and his co-worker Ray Groller. The comments by Gagliardi, referring to Gagliardi's reluctance to join Dawson on sales calls in his territory because he "might not make it out," are at best ambiguous. Dawson himself testified at deposition that could not say if these comments were "racist or not" and that Gagliardi could have been referring to Dawson's territory being high-crime and "pretty rough." The comments by Groller, in contrast, are unambiguously racist. Dawson testified that Groller on one or two occasions made jokes referring to

-56-

people of African ancestry as "spooks" or "monkeys" and on several occasions had referred to those of Asian ancestry as "gooks" or "slant-eyed bastards." Dawson conceded that, after he complained to PNT management about the "spook" and/or "monkey" comment, Groller was made to apologize.

These comments, even taken together and combined with Dawson's other allegations of racially-motivated harassment discussed earlier, are insufficient to support a hostile work environment claim. Groller's offensive comments concerning Asians cannot support Dawson's claim because they were not directed at either Dawson or his race. See Caver, 420 F.3d at 263. The remaining comments - Gagliardi's ambiguous reference to Dawson's territory and Goller's unambiguous and ugly "joke" about spooks and/or monkeys - are the type of isolated incidents that are not severe or pervasive enough to support a hostile work environment claim. Dawson, therefore, has not presented sufficient evidence to establish a genuine issue of material fact as to the first two elements of his hostile work environment claim: that he suffered intentional discrimination because of his race and that this discrimination was pervasive and regular.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINCOLN DAWSON, JR. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA MEDIA | : | |
| HOLDINGS, LLC | : | NO. 06-3604 |

#### ORDER

AND NOW, this 18th day of July, 2008 upon consideration

of the defendant's Motion for Summary Judgment (Docket No. 22)

and the response thereto, and after oral argument, IT IS HEREBY

ORDERED that the Motion is GRANTED for the reasons set forth in

the accompanying Memorandum of Law.  Judgment is hereby entered

for the defendant Philadelphia Media Holdings, LLC and against

the plaintiff Lincoln Dawson, Jr.

This case may be closed.

BY THE COURT:

MARY A. McLAUGHLIN, J.